◼ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ANGEL BARRETO, Appellant.—Appeals by the defendant from two judgments of the County Court, Nassau County (Boklan, J.), both rendered July 24, 1986, convicting him of murder in the second degree, robbery in the first degree, manslaughter in the second degree (two counts), and petit larceny under indictment No. 60822, and murder in the second degree, attempted robbery in the first degree, and attempted robbery in the second degree, under indictment No. 61967, upon jury verdicts, and imposing sentences. The appeals bring up for review the denial, after a hearing, of that branch of the defendant's motion which was to suppress his statements to law enforcement authorities.

Ordered that the judgments are affirmed.

At approximately 10:00 P.M. on March 30, 1985, the defendant and his accomplice Manuel Cruz entered the Foodtown supermarket in Island Park and accosted the manager Mario Burgio, who was in the process of closing the store. The defendant pointed a loaded pistol at Mr. Burgio, cocked it and told him, "don't move, give us the keys to the safe or I'll blow your brains out". The two men then forced Burgio into the office where the safe was located. Barreto heard footsteps so he gave the gun to Cruz and left him to guard Burgio while he investigated. On leaving the office he observed Patricia Burgio who had been in the store with her husband. Barreto grabbed her and was pushing her toward the office when a loud shot was heard. Cruz came running out of the office and told Barreto that he had shot Burgio accidentally, when the gun went off as Burgio tried to free himself from a headlock. Cruz took the keys from Burgio's body and they forced Mrs. Burgio to the rear of the store where they attempted to unlock the doors. Unable to find keys to all the locks they attempted to break them with a bolt cutter and some other tools they found in the store. At this point Joseph Harper the night porter, who, unbeknownst to the defendants, had been sleeping upstairs, came down and observed them trying to escape. He recognized Cruz as a former employee of the store and he assumed that they had been accidentally locked in. He advised them that they would have to call a manager to unlock the doors. As Harper and the defendants began walking toward the front of the store Harper saw blood and part of Burgio's body through the office door and he realized what had occurred. Cruz drew a gun and told Harper that if he said anything they would be back to kill him. Barreto threw a shopping cart through the plate glass windows in the front of the supermarket. As the defendant and Cruz ran through the parking lot, they were observed by a cashier who worked in the store. Although she did not recognize Barreto she was able to identify Cruz.

By talking with Harper and the cashier the police learned that Cruz was one of the perpetrators. They also learned from another store employee that just before closing time Cruz was seen in the store talking to his cousin Jamie Velasquez, who worked at Foodtown. The police interviewed Velasquez who initially stated that he had not seen his cousin since the early afternoon just before he left for work. Eventually he admitted that he had seen Cruz and Barreto after the incident when at their request he had driven them to a motel on Cross Bay

Boulevard in Queens. Armed with this information and the assistance of Angel Barreto's brother-in-law, who was a New York City police officer, the police were able to arrest the defendant and Cruz less than 24 hours after the crime.

After their arrest both Barreto and Cruz agreed to give statements to the police. Barreto admitted that it was his idea to rob the Foodtown and he described how he enlisted Cruz's aid. He also alleged that Jamie Velasquez had agreed to assist them in the plan by advising them when the store was about to close. He stated that Velasquez also consented to meet them after the robbery and hide the gun and any proceeds of the crime. He went on to describe how he and Cruz attempted to commit the robbery and the resulting death of Mario Burgio. Cruz gave a confession, fully implicating himself in the crime, which was remarkably similar to Barreto's confession. The police then reinterviewed Velasquez and he gave a second written statement in which he claimed that "he knew" that Manuel and Angel were going to rob the store. He admitted that prior to the robbery he told Manuel and Angel that the store would be closing "in a few minutes" and he conceded that he received and hid the gun after the crime.

Prior to trial the defendant moved for a severance of his trial from that of his codefendants on the ground that the admission of his codefendants' statements would constitute a violation of his right to confront and cross-examine witnesses. The court denied this motion finding that all the confessions were sufficiently "interlocking" to avoid any prejudicial effect. As each statement was admitted into evidence the court cautioned the jury that the statement could be used only against the defendant who made it.

On appeal the defendant argues that his conviction must be reversed in light of the Supreme Court decision in *Cruz v New York* (481 US 186).

There is no doubt that the admission of his codefendants' statements violated the defendant's rights under the Confrontation Clause since the codefendants' confessions were not redacted *(see,* US Const 6th Amend; *Richardson v Marsh,* 481 US 200). However, in light of the defendant's own inculpatory confession as well as the other overwhelming evidence of his guilt, any error was harmless beyond a reasonable doubt *(see, People v West,* 72 NY2d 941; *People v Hamlin,* 71 NY2d 750). The defendant's own confession was comprehensive and satisfactorily explained his part in the crime without reference to the codefendants' statements *(see, People v Hamlin, supra,* at

758; *People v Green,* 138 AD2d 516). Moreover, the testimony of Patricia Burgio and Joseph Harper identifying the defendant as one of the perpetrators completely corroborated the defendant's statement *(see, People v West, supra; People v Hamlin, supra,* at 759; *People v Green, supra).* Under the circumstances there is "no reasonable possibility that the erroneously admitted evidence contributed to the conviction" *(People v Hamlin, supra,* at 756).

The defendant's argument that his statements should have been suppressed because they were taken in violation of his right to counsel is without merit. The record reveals that at the time of his arrest the defendant had a criminal charge pending against him in New York City. When questioned by the police regarding his prior arrests the defendant indicated that he had been arrested in New York City in 1984, but it had been "all taken care of". Given the defendant's representation that the charge was no longer pending the police cannot be charged with either actual or constructive knowledge that there was a pending charge or that he was represented by counsel *(see, People v Bertolo,* 65 NY2d 111; *People v Bartolomeo,* 53 NY2d 225; *People v Jacobs,* 119 AD2d 695). Moreover, since the investigation of the current crime was handled by the Nassau County police and the prior charge, for a relatively minor crime, was pending in New York City, it cannot be argued that the police displayed bad faith in accepting the defendant's statement that the previous charge against him had been disposed of *(see, People v Jacobs, supra).*

We also reject the defendant's contention that his conviction must be reversed because the People delayed in turning over certain *Rosario* material which consisted of notes made by the officer who conducted ballistics tests on the gun which killed Mario Burgio. The record reveals that the defendant was not substantially prejudiced by the delay *(see, People v Ranghelle,* 69 NY2d 56, 63). The material was produced before the officer testified and the court offered the defendant an adjournment if, after reviewing the notes, the defendant wished to have his own expert examine the gun.

Prior to the start of trial, counsel waived the defendant's presence in order to discuss certain procedural matters with the court. At the end of the trial after deliberations had begun, the attorney noticed one of the jurors apparently taking notes during a recharge on the law. When this incident was reported to the court, it, with the agreement of all the attorneys, sent its head clerk to the jury room to collect any notes which the jurors may have written. The defendant now

claims that he was deprived of his right to be present at all material stages of his trial. The proceedings which took place here were not material since they did not bear " '[any] relation, reasonably substantial, to the fullness of his opportunity to defend against the charge' " *(People v Ciaccio,* 47 NY2d 431, 436; *see also, People v Mehmedi,* 69 NY2d 759).

The sentence imposed was not unduly harsh or excessive and did not constitute an improvident exercise of discretion *(see, People v Suitte,* 90 AD2d 80). We have considered the remaining contentions raised by the defendant and find them to be without merit. Bracken, J. P., Lawrence, Spatt and Harwood, JJ., concur.